## UNITED STATES v. TWO HUNDRED CASES, MORE OR LESS, OF CANNED SALMON (two cases).

(District Court, S. D. Texas, at Galveston.   April 28, 1923.)

Nos. 419, 531.

**1. Food ⬡⇒24—Right of claimant to intervene in forfeiture proceedings.**

In a suit for forfeiture of a food product as adulterated or misbranded, it is too late to question the right of a claimant to intervene after the case has been tried.

**2. Food ⬡⇒15—Inferior quality of canned salmon labeled "select" held "misbranded."**

Canned salmon, labeled "select" and "fresh fish," when the pack was of inferior quality and not fresh, as the term is used in the trade, *held* misbranded.

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Misbrand; Misbranding.]

**3. Food ⬡⇒6—Article containing filthy substance is "adulterated."**

Under Food and Drugs Act, § 7 (Comp. St. § 8723), an article of food is adulterated, and subject to condemnation and forfeiture, if it is composed in whole or in part of a filthy, decomposed, or putrid animal or vegetable matter, and it is not necessary that it be shown to be unfit for food, or deleterious, if eaten.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Adulterate; Adulteration.]

**4. Food ⬡⇒ 24—Meaning of the term "article" in the Food and Drugs Act stated.**

The word "article," in Food and Drugs Act, § 10 (U. S. Comp. St. § 8726), providing for condemnation of any article of food found adulterated or misbranded, applies to the food itself, and not to the case or package in and by means of which the shipment is effected.

[Ed. Note.—For other definitions, see Words and Phrases, First Series, Fresh Fish; First and Second Series, Article.]

**5. Food ⬡⇒24—Proof of 20 per cent. of cans adulterated, and 80 per cent. unadulterated, held not to authorize condemnation of all cans.**

While proof that the contents of 20 per cent. of cans in a shipment of salmon were adulterated, with nothing more, might authorize the inference that the whole product was bad, and therefore support a condemnation of the lot, where the same proof which establishes the adulteration of one-fifth establishes the lack of adulteration of the balance, the government must fail, except as to the cans particularly identified as adulterated.

Proceedings by the United States against 200 cases, more or less, of canned salmon.   Judgment of condemnation for misbranding.

H. M. Holden, U. S. Dist. Atty., and Edwin R. Warnken, Asst. U. S. Atty., both of Houston, Tex.

Stewart, DeLange & Milheiser, of Houston, Tex. (Albert DeLange, of Houston, Tex., of counsel), for defendant.

HUTCHESON, District Judge.   These two cases are proceedings under separate numbers against two lots of salmon—one originally libeled in Galveston, and proceeded against in Galveston under D. L. No. 724, later transferred to Houston; the other libeled against in Houston, and proceeded against in Houston under D. L. No. 419. The government contends for condemnation and forfeiture on the

ground (1) that the articles are misbranded; and (2) that they are adulterated, in that they consist wholly or in part of filthy, decomposed, and putrid animal substance, in violation of sections 7 and 8 of the Food and Drug Act of 1906 (Comp. St. §§ 8723, 8724).

[1] In each of these cases the Seaboard Company appeared as claimant, and filed exceptions and answer, and under orders of the court, by agreement between the parties from time to time, samples of the seized shipments were taken and examined. Not until the trial had concluded was any point made as to the right of the claimant to appear and claim, and at that time the government's counsel made the contention that the interest of the claimant was not shown. This motion, if it ever was meritorious, comes too late. United States v. Forty-Six Packages (D. C.) 183 Fed. 644.

[2] Each can had on it a pinkish red label, showing a picture in relief of a salmon. Under it the words, "Select Pink Salmon." By the side of the picture the following: "Keen-eye inspection. Fresh fish. Clean canneries." And this was in white lettering. In black letters to simulate a stamp was the word "Inspected." The evidence on the part of the government was that this product was not government inspected, and that if the stamp was intended to make the impression of government inspection, it was false.

The evidence of the government was also overwhelming that the fish was not fresh fish, in the sense of that term as used in the canning trade; that is, fish canned when they had been on the floor not over 48 hours, which was the time limit fixed by the government witness, and not contradicted, within which fish could be said to be fresh. The testimony was also overwhelming that the fish, if not putrid or rotten, was a poor, and therefore not a select, pack of pink salmon, for while pink salmon is according to the testimony one of the inferior brands, it varies in quality according to the freshness and general character of the fish put up.

It is therefore clear to me that the articles seized have offended against the misbranding statute, one purpose of which is to protect purchasers from injury from the sale of inferior for superior articles. Hall-Baker Grain Co. v. U. S., 198 Fed. 615, 117 C. C. A. 318; United States v. 150 Cases (D. C.) 211 Fed. 361. And that deception being present and that ground of forfeiture clearly existing, it would, but for the provisions of Rev. St. § 8726, authorizing the court in its discretion to direct the redelivery of the articles to the owner, be unnecessary for the court to pass at all upon the question of whether, as to any part of the shipment, the government has made a case on its second ground. Upon the issue of whether the product was filthy, decomposed, or putrid, the evidence was in sharp conflict.

[3] I agree with the government that it is not essential under this subdivision of section 7 to establish that the articles were unfit for food, or deleterious if eaten. It is sufficient if the government establishes that the article sought to be condemned was composed in whole or in part of decomposed, filthy, or putrid animal substance. That the contents of some of the cans contained in the shipments under seizure were of the character described in the government's libel I have no

doubt. That a great many of them were not, the government's own testimony established, for, taking the method of testing by sample which the government itself claims to be fairly correct, they reached the conclusion that something like 18 per cent. of the seizure was filthy, putrid, and decomposed, leaving 82 per cent. not within the terms of the second ground of their libel. While the claimant's witnesses testified to having made chemical tests of some of the samples, finding no evidence of decomposition, and also to having experimented by serving some of the contents of the cans as food without harmful result.

[4] It is the claimant's contention that the test applied by the government of smelling is insufficiently certain to justify condemnation, and that even the percentage of defectives testified to by the government has not in fact been shown; but they claim further that, conceding as much defective fish as the government's witnesses contended for, that the government has not made a case for the condemnation of cans not already tested and proved to be bad; that, in short, it is incumbent upon the government to either prove that they have examined each can and found it defective, or that they have established such regularity of defects as to support the inference that all the cans are defective.

The government relies for the contrary of this upon the opinion of the Circuit Court of Appeals of the United States in U. S. v. A. O. Andersen, 284 Fed. 542, an opinion from the Ninth Circuit, in which the Circuit Court declared that the "article" referred to in the condemnation statute did not mean the single or individual can of salmon, but was used generically as referring to the entire salmon shipment under seizure as one thing, and that, if the government proved that one-fifth of the entire product was unfit for human consumption, it would be competent for the jury to infer from that that the balance was also.

To these conclusions I am not prepared to lend my adherence. I concede the force of the reasoning that in section 8726 the language, "any article of food, drug, or liquor," if standing alone, might well have a generic meaning as relating to the character of the shipment, whether salmon, or pork, or beans, or what not, and that it may well be said to be a case of using the word "article" as a singular plural, or a plural singular. However, in the caption of the act the plural is used, and in the body of the act it is provided that:

"Upon the payment of costs, and the execution and delivery of a good and sufficient bond to the effect that such articles shall not be sold, they may be delivered."

Again, in the discussion of similar words in other places in the statute, the Supreme Court has seemed to take a different view from that expressed in the Andersen Case. In Hipolite Egg Co. v. United States, 220 U. S. 52, 31 Sup. Ct. 364, 55 L. Ed. 364, the court treats the articles as the contents of packages designed for food, and discusses the question of original packages as applied to the original box in which they come shipped, as distinguished from the can or package containing the food itself, and in the discussion makes it clear that they treat the word "article" as the food itself contained in the package designed for delivery to the consumer. In Hoke v. United States, 227 U. S. 323, 33

Sup. Ct. 281, 57 L. Ed. 523, 43 L. R. A. (N. S.) 906, Ann. Cas. 1913E, 905 the Court said:

"In the Hipolite Egg Co. Case we denominated adulterated articles as 'outlaws of commerce.'"

In McDermott v. State of Wisconsin, 228 U. S. 130, 33 Sup. Ct. 431, 57 L. Ed. 754, 47 L. R. A. (N. S.) 984, Ann. Cas. 1915A, 39, the court showed clearly that it considered that the word "article" referred to the adulterated thing itself, rather than the package or case in which it came in shipment.

[5] Again, if the reasoning in the Andersen Case is accepted, and the word "article" is to be taken generically, still the conclusion reached in that opinion does not follow, that proof that of the cans examined one-fifth were bad and four-fifths were good would authorize the jury to find the whole product bad. It might well be as in the oyster case (Notices of Judgment, 4922), opinion by Judge Hand, that where only a part of the shipment was examined, and that part ran uniformly bad, the jury would be authorized to find, if that was a fair sample, that it indicated that the whole shipment was bad; but it would not at all follow, but rather the contrary, that if a shipment was examined, and the examination showed as it proceeded that one-fifth was bad and four-fifths good, that the court could order the whole product condemned.

The case, in short, is not one where the government has proven a part of it bad as a basis for the inference that all was bad, but one in which the very proof of the government establishes that part of it is not bad within the meaning of the statute, and I am inclined to think that if the government depended for its condemnation upon subdivision 6 of section 7 of the act, in accordance with the general rule of law that the burden is upon the government to prove its case, the government would have to be cast in this suit, or would have to take the alternative of examining and testing every can of the shipment. Since, however, the goods are to be condemned for misbranding, the court now makes it known that it is of the opinion that some part of the shipment is bad, and that the goods will not be released under bond to the owner merely for rebranding but only upon condition that the goods be re-examined and reclassed, the good being separated from the bad.

Since it is not known whether any application for the withdrawal of the goods will be made, it is sufficient now to direct that a judgment of condemnation and forfeiture be entered.