UNITED STATES v. 935 CASES, MORE OR
LESS, EACH CONTAINING 6 NO. 10
CANS OF TOMATO PUREE.

Civ. No. 21218.

District Court, N. D. Ohio, E. D.

April 16, 1946.

504

Don C. Miller, U. S. Dist. Atty., of Cleveland, Ohio, for plaintiff.

Edwin H. Chaney, of Cleveland, Ohio, and Bachelder & Bachelder, of Indianapolis, Ind., for defendants.

JONES, District Judge.

The United States, by amended complaint, seeks to condemn 935 cases, more or less, of tomato puree shipped in interstate commerce by the Ladoga Canning Company, Lebanon, Ind., as consignor to the Weideman Company in Cleveland, as consignee.

Several samples of the tomato puree were seized and examined by the Food and Drug Administrator in the warehouse or storeroom of the consignee.

The consignor has answered and while admitting certain procedural allegations denies the charges respecting the adulterated character of the tomato puree; denies that it is subject to seizure and confiscation and denies that it was shipped contrary to the jurisdiction of the United States and this Court.

In view of certain stipulations and the fact that findings and conclusions probably later will be presented for adoption it seems unnecessary to review or summarize the evidence, but only to set down the Court's consideration of and conclusions upon the issues presented.

In general, two main questions require response. First, were the samples seized representative of the article or product shipped in interstate commerce, and, second, does the evidence support the Government's charge that the tomato puree should be condemned as being adulterated within the meaning of Section 342(a) (3) of Title 21, United States Code Annotated.

■■ It seems reasonable to construe the jurisdictional and procedural statute (Section 334) and the word "article" used therein to include an entire shipment of the same product regardless of the fact that some cases or cans of the product in the shipment were so labeled or coded by the shipper as to indicate different dates of canning. I think the "article", as used in the statute, is the product shipped in the cases or cans and not the individual cases or cans. It would be impractical for the Government to examine samples from each case or can in the shipment on the theory that each case or can was an "article" in the sense of the statute. If the samples are reasonably representative of the lot shipped,—that is, taken at wide random from the entire shipment it is in my opinion sufficient to embrace the entire shipment in the condemnation.

■ As to the question of the construction of the statute claimed for by the defendant during the trial,—that the words "if it is otherwise unfit for food" modify, limit or add any additional requirement of proof to the preceding words, I do not so interpret the language even though one may concede that the Congress, to the extent of its power, was by law intending to protect the public from food unfit for human consumption. On the contrary, while I think that it is not compelled or essential, there may be drawn a fair inference from the language that Congress considered that proof of the condition described made the particular article or product unfit for food.

The evidence of the Government is that upon examination the samples taken show a substantial state of decomposition of the puree due to the presence of an excessive mold count, rot fragments, fly eggs and fly maggots and that this condition undoubtedly was due to the use of rotten tomatoes, since no one asserts that such condition likely could come into existence after sealing of the cans.

■ The defendant offered testimony to show the care with which its tomato puree was prepared for canning and also evidence to support its claim that the product in question can not, under the most careful supervision, escape entirely having some substances such as the Government claims existed in the samples; that the Administra-

tor of the Food and Drug Act recognized this situation and circulated certain information respecting tolerances which would be recognized in the determination of whether the particular product came within the requirements of the statute. However that may be, difficulty in producing a product which is not in whole or in part decomposed in the sense of the statute furnishes no exception to the legislative requirement or inhibition. The fact that a product can not be prepared and shipped in interstate commerce except in a decomposed or rotted state certainly can not justify permitting it so to be transported considering the plain language and purpose of the statute; nor are conditions of weather or methods of canning important if the product is found to be decomposed and rotten upon examination following interstate shipment. These considerations, as they seem to me, are not entirely to be waived aside by the fact that certain tolerances or allowances may have been recognized by the Food and Drug Administrator in the administration of the statute. If the product was under the evidence in a state of substantial decomposition and rotten, as those terms are well understood, that ends their right to interstate shipment and condemnation is in order.

█ The present statute supersedes any earlier regulation of the Food and Drug Administrator and while recognition of practices or tolerances adopted by the Administrator is to be taken into account and given due weight in applying the statute, the fact remains that here the evidence, in my view, shows an excess of substantial parts above the tolerances adopted, and it must be borne in mind that Section 336 of the Act does not directly authorize exemptions but specifically gives the Administrator a discretion not to report or prosecute minor violations.

That this is a conclusion rightly to be reached will be understood by reference to Section 345, wherein the Administrator is given power to promulgate regulations exempting certain requirements, and Section 346 authorizes regulations for tolerances in respect of poisonous ingredients. No such provision for regulation making exemptions, or for tolerating unavoidable ingredients is provided with respect to Section 342(a) (3).

Nor am I impressed with the testimony that the variable sense of smell and taste is more dependable in detecting rot than the microscopic procedure adopted by the Government. Certainly the question of adulteration would rest upon tenuous ground if reliance or conclusion as to the character of the product shipped were bottomed upon conflicting evidence as to the smell or taste of the article sought to be condemned.

It is probably true that there will be a difference of opinion even under the microscopic procedure but for the want of a more reliable test it seems reasonable to accept such results depending, of course, upon the Court's conclusion as to the credibility of the witnesses testifying and giving their opinions upon that subject.

██ The Act must be interpreted liberally in the interest of the congressional purpose to prohibit the transportation of adulterated foods in interstate commerce. In my judgment the Government has sustained the burden of proof and it follows from what has been said that condemnation of the entire shipment of tomato puree must be ordered.

Proposed findings and conclusions may be submitted for approval and adoption accordingly.

█ After entry of a decree carrying into effect the judgment of the Court the defendant, or condemnee, may have the benefit of the provisions of Section 334(d).